**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 3:04-00199 |
| | ) Judge Echols |
| JEFFREY SCOTT HERNDON | ) |

## MEMORANDUM

Pending before the Court is Defendant's "Motion and Incorporated Memorandum to Suppress Unlawfully Obtained Evidence" (Docket Entry No. 16) and Defendant's "Motion to Suppress Evidence Seized By United States Marshals" (Docket Entry No. 17), both of which have been responded to by the government (Docket Entry No. 25). An evidentiary hearing on the motions was held July 27, 2005.

## I. FINDING OF FACTS

During the course of the July 27, 2005 evidentiary hearing, the Court heard from numerous witnesses, including the Defendant. Having reviewed the exhibits received, and the testimony of the witnesses, after considering their interests and demeanor, the Court finds the following to be the relevant facts.[1]

On November 17, 2004, a federal grand jury returned a two count indictment against the Defendant, Jeffrey Scott Herndon.

---

[1]Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Additionally, during the course of the evidentiary hearing, testimony was given about extraneous matters not relevant to the pending motions and consequently the Court will not make any findings with respect to such matters.

1

Count One alleges that from on or about November 21, 2000 through on or about February 4, 2003, Defendant knowingly received and attempted to receive child pornography which had traveled in interstate and foreign commerce. (Docket Entry No. 1). Count Two alleges that on or about February 3, 2003, Defendant possessed a computer and external hard drives that contained images of child pornography which had traveled in interstate and foreign commerce. (Id).[2]

At the time of his arrest on the federal charges, Defendant was being held on state charges arising out of the same possession of child pornography. The events leading to that arrest are as follows.

On November 1, 2001 Defendant was convicted on a plea of guilty in the criminal court of Davidson County, Tennessee to several counts of sexual exploitation of a minor. (Govt. Ex. 2). After serving nine months, Defendant was placed on probation and subject to certain terms and conditions. Additionally, because he had been convicted of a sex crime, Defendant was placed under "Sex Offender Directives" ("Directives") by the Tennessee Board of Probation and Parole.

---

[2]The Indictment also contains a forfeiture count wherein the government seeks the forfeiture of any and all visual depictions of child pornography Defendant had in his possession as well as personal property, including a Macintosh Powerbook G3 and accompanying external hard drives. (Docket Entry No. 1).

Under a general "Probation Order," Defendant agreed to comply with all laws and municipal ordinances. (Id.). He also agreed to work at a lawful occupation. (Id.). Defendant signed that agreement on May 10, 2002, and, in doing so, represented that he understood the terms and conditions and agreed to comply with them. (Id.).

Pursuant to the Sex Offender Directives, Defendant agreed not to "purchase or possess any pornographic or sexually explicit materials." (Govt. Ex. 3, Directive 1). Defendant was also to "attend, participate in and pay for any treatment and/or counseling deemed necessary by either the Parole Board, the Court or [his Probation] Officer." (Id., Directive 4). Unless otherwise authorized, Defendant was not "to possess, or access any type of photography, video rendering, digital imagery, or the equipment for the production of such, of any person under 18 years of age." (Id. Directive 17). Further, Defendant was not to have Internet access on his computer "unless permission for Internet capability has been approved in writing by your Officer." (Id. Directive 5). Defendant was never given permission to have Internet capabilities on his computer.

To ensure compliance with the no Internet directive, Defendant consented to having his computer checked for such access. Specifically, Directive number five provided: "You consent to your

3

Officer checking your computer and any software at any time for Internet capability or activity."  (Id.).

Initially, Defendant was supervised by Probation Officer Marta Parsons ("Parsons").  Parsons first met with Defendant on May 2, 2002.  At that time, the two went over several documents including the general Probation Order and the Sex Offender Directives.  With regard to the Sex Offender Directives, Defendant signed an "Acknowledgment and Certification" wherein he acknowledged reading and understanding the Directives.  Additionally, he acknowledged that if he did not agree with the directives, he had "the right to petition the Court or the Board for a modification" of the Directives.  Defendant did not object to the Directives at the time he signed them in front of Parsons, nor did he thereafter petition either the Court or the Board for a change in the directives.

Quite apart from signing the Acknowledgment, Defendant admits he had read the form and the form had been read to him by Parsons. Defendant testified he is very precise in everything that he reads and signs.

As a part of his probation, Defendant attended counseling for sex offenders conducted by John Brogden ("Brogden"),[3] the owner and director of   the Association for Sexual Abuse Prevention in

---

[3]Brogden has been involved in sexual offender treatment for twenty-seven years.

4

Nashville.  Defendant was in the program from May 2002 until February 2003.

Defendant was far from a model attendee. He had extreme views about the propriety of sex with minors, he did not participate in the program as he should have, and he got behind in the payment of his fees.  The final straw was letters Defendant had written as a part of the program requirements.

Members in the program were supposed to write a letter of apology to their victim(s).[4]  Defendant wrote a letter dated January 7, 2003 to "Nikki"[5] wherein he basically blamed Nikki as much, if not more, than himself for his legal difficulties. (Govt. Ex. 4).  Brogden found this unacceptable and told Defendant to rewrite the letter.  Defendant then tendered a document which was in no way a letter of apology. (Govt. Ex. 5).  Instead, Defendant submitted a document expressing his views that children should be allowed to learn about sex from adults and other ideas along those lines. (Id.).

_____

[4]The letters were not actually going to be sent to the victims.

[5]During the course of the evidentiary hearing, an attempt was made to show that Nikki was a 22 year old stripper and was not the "victim" of the offense.  Instead, according to Defendant's initial version, Nikki first posed topless for Defendant at the store where he was a clerk in order to buy beer and then brought a minor to the store to do the same.  Whether Nikki was the victim is of no moment because Bragdon thought Nikki was the victim and because the letter was supposed to be written to the victim.

At about the time Defendant submitted the "apology letter" and its follow-up, Defendant was assigned a new Probation Officer[6] by the name of George Harrien ("Harrien"). Harrien first met with Defendant in January 2003.

On February 4, 2003, Defendant met Harrien for a regularly scheduled probation meeting. Of primary concern during that meeting was Defendant's inability or unwillingness to find and keep a job. Defendant told Harrien that he had looked for jobs and further that he had looked for jobs on the Internet. Accessing the Internet was a violation of the Special Directives.

After the meeting with Defendant, Harrien met with his Supervisor to express his concerns about Defendant's access to the Internet. He also spoke with Brogden and the two discussed the apology letter and its follow-up.[7]

Harrien then went to the courthouse to review Defendant's file. Given the offenses of conviction and Defendant's statement about accessing the Internet, Harrien became even more concerned. He then spoke again with his supervisor and obtained permission to go and check Defendant's computer.[8]

─────────────

[6]His former Probation Officer had transferred to a different county.

[7]Brogden had an office in the same building as Harrien.

[8]It was Harrien's understanding that the request to check the computer had been run up the chain-of-command and that the search was approved by the Executive Director of the Tennessee Board of Probation and Parole.

6

At approximately 3:00 p.m. on February 4, 2003, Harrien along with Probation Officer Burden ("Burden") arrived at Defendant's residence which was located at 4809 Barclay Square Drive, Antioch, Tennessee. Defendant answered the knock on the door and, after Harrien and Burden identified themselves, he invited the Probation Officers inside.

Upon entering, Harrien told Defendant the Officers were there to check his computer. Defendant did not object, but instead led them to his bedroom.

Defendant went to the bed in his bedroom and pulled aside his pillow which revealed a MacIntosh laptop[9] which was running. On the screen was a window with a taskbar for the Internet history which Harrien pulled down. The taskbar revealed women's names but the files were not accessible.

While Harrien was looking at the computer, Burden noticed an external drive protruding from the sheets near the foot of the bed. The external drive was humming, indicating it was on, but was not connected to the laptop.

Because the taskbar indicated the listed files were not accessible, Harrien inserted pre-search software[10] which revealed

_____

[9]The desktop contained an icon for Internet access. However, it was not readily identifiable as such, but instead was a red circle with an "A" in it.

[10]The pre-search software autoscans the hard drive looking for picture files such as .gif and .jpg files. Found pictures are displayed twelve to a screen.

7

the presence of pornography, although not necessarily child pornography. Possession of any pornography, however, was a violation of probation.

Harrien then ran the pre-search software on the external drive which had been lying at the foot of the bed. Almost immediately, twelve images of child pornography appeared.

Upon seeing the child pornography, Harrien tried to contact the legal department at the Bureau of Probation and Parole but found they were closed for the day. He then called an Assistant District Attorney who sent police officers to the scene.

Detective Kevin Cooley ("Cooley") of the Nashville Police Department's Sex Crimes Unit came to the scene after being called by uniformed officers. Defendant, who by then was in handcuffs, refused to talk with Cooley.

Upon viewing the twelve images on the screen, Cooley seized the laptop computer, as well as the two to three external hard drives which were wired to the computer. Defendant was taken downtown and booked on state charges relating to the items seen on his laptop.

On February 18, 2003, Cooley prepared a "Statement of Probable Cause Against Jeffrey S. Herndon." (Govt. Ex. 6). In the Statement, Herndon requested that a search warrant be issued which would allow the search of Herndon's computer and storage devices for any "electronic mail transmissions, IRC chat logs, internet

bookmarks, internet activity files; as well as digital forms of: letters, papers, receipt, invoices, statements, photographs, videos, computer graphic image files or other visual representations of children (minors) engaged in sexual activity or simulated activity that is pictures, drawings, photographs, digital videos, computer graphic image files or other visual representation of children (minors) engaged in sexual activity or simulated activity that is patently offensive as defined in <u>Tenn. Code Ann.</u> § 39-17-1002 and a violation of <u>Tenn. Code Ann.</u> § 39-17-1003 Sexual Exploitation of a Minor." (<u>Id</u>.).

That same day, Judge Mark Fishburn of the General Sessions Court issued a search warrant allowing a search of the laptop and external drives which had been seized. Specifically, a search was permitted as to "any pictures, drawings, photographs, digital videos, video cassettes, computer graphic image files, or other visual representations of children (minors) engaged in sexual activity or simulated sexual activity in violation of Tenn. Code Ann. § 39-17-1003, sexual exploitation of a minor." (<u>Id</u>.). All of the items described in the search warrant related to pictures or videos. There was no mention of any letters, papers, or documentary evidence to be searched.

After the return of the federal indictment, Defendant was picked up at the Criminal Justice Center to be brought to the Federal Courthouse for processing by the United States Marshal's

Service.   Defendant left the county jail in the custody of Tennessee Bureau of Investigation agent James Patterson.  At the time, Defendant had  a white garbage-sized bag containing his personal effects.  The bag was searched at the county jail, but only for weapons or other contraband.

The Marshal's Service has guidelines related to what items an individual in its custody can have in his or her possession. Generally, a detainee can keep up to $50.00 in cash, a wedding ring (if it has no stones in it), religious medallions (provided they are not too large or do not pose a security threat), medications (which are inventoried), and legal documents.  For those already in federal custody, items that are not allowed are given to the defendant's attorney to return to a family member.  If the individual is a new arrestee (including those brought over on federal charges for his or her first appearance) the prohibited items are given to the officer or agent who brought the individual to the Marshal's office.

The reason for the screening process is to assure the facility remains free of weapons and contraband.  Additionally, the Marshal's service has no facilities to store the many things that individuals have on their possession when they are brought in to the facility.

After arriving at the intake area of the Marshal's office, Supervisory Deputy Marshal Mike Fielder ("Fielder") noticed the

10

large white bag and asked where Defendant had come from. Inside the bag were assorted documents which Fielder scanned. One such document was titled "Spring-Sex Slave." Fielder knew of the charges against Defendant and after running across that document as well as others of similar ilk, Fielder thought they may be of some interest to Agent Patterson. Fielder called Patterson who returned and picked up the items.

## II.  APPLICATION OF LAW

There are two motions to suppress. The first motion deals with the items which were seized as a result of the search of the computer. The second deals with the taking of the documents which were found in the large white bag when Defendant was placed in the care of the Marshal's Service.

## A.  Computer Search

Defendant's motion with respect to the search of his laptop and external drives is essentially two-fold. He seeks to suppress all items which were seized as a result of the search warrant. Alternatively, he seeks to suppress any documentary evidence (as opposed to pictures or videos) which were found on the computer or drives.

### 1.  *Seizure of Videos and Pictures*

In Griffin v. Washington, 482 U.S. 868, 107 S.Ct. 3164, 97 L.Ed2d 709 (1987), the United States Supreme Court found that the unique circumstances of probation created "special needs beyond the

11

normal need for law enforcement." Id. at 873. Because of that, pursuant to a reasonable regulatory or administrative scheme authorizing searches, police can search a probationer's residence without a warrant if they have reasonable cause to believe that a violation of a probation condition was taking place. Id.

Subsequently, in United States v. Knights, 534 U.S. 112, 122 S.Ct. 587 (2001), a unanimous Supreme Court held that a probation search is also valid if reasonable under Fourth Amendment principles. Probationers have a lesser degree of privacy than those in the general populace and hence probation searches pursuant to a probation agreement are permissible so long as supported by reasonable suspicion, regardless of the reason for the search. Id. at 591-93.

In his brief in support of the motion to suppress, Defendant recognizes the Supreme Court in Knights "found that government agents may conduct a warrantless search of a probationer's home pursuant to a search condition in a valid probation agreement when they have 'reasonable suspicion' that the probationer is in violation of the probation agreement." (Docket Entry No. 16, p. 6). Despite that recognition, Defendant asserts that, unlike in Knight, the probation agreement did not provide for a general search but instead allowed only for the checking of the computer and software for any internet capability or activity. (Id.). By

12

inserting the pre-search disk, the probation went far beyond the consent given.

In this Court's view, Defendant reads the Sexual Directives too narrowly.  The Directives, which Defendant understood, allowed the Probation Officer to check not only for Internet capability, but also for <u>activity</u>, which was one of the prohibitions of Defendant's probation.

By definition, "activity" means "the quality or state of being active."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY p.22 (1986).[11]  To determine whether Defendant had been "active" on the Internet, the Probation Officer chose to look to see what items Defendant may have downloaded from the Internet.  Such actions were not beyond the scope of the consent given in the Directives.[12]

Defendant also asserts the search conducted by Harrien "was not based on 'reasonable suspicion' as required by <u>Knights</u>" because all Harrien "knew was that the counselor in the sex offender treatment program was unhappy with Mr. Herndon's performance and

---

[11]If, as Defendant would have it, the Directives only allowed the Probation Officer to determine whether Defendant could access the Internet, the inclusion of the word "activity" would be unnecessary.

[12]In this regard, Defendant's reliance on <u>United States v. Turner</u>, 169 F.3d 84 (1ˢᵗ Cir. 1999) is misplaced.  There, an assault occurred in a neighboring apartment and the defendant consented to police searching his apartment for any signs the suspect had been in the Defendant's apartment or any evidence of the assault.  The First Circuit found that the consent did not allow for the search of the Defendant's computer which revealed evidence of child pornography.

13

that Mr. Herndon had allegedly indicated that he was looking for a job on the internet." Id. Harrien knew much more than Defendant suggests.

Leaving aside the fact that Defendant told his probation officer that he had been looking for jobs on the Internet (itself a violation of probation and a basis for a search, see, United States v. Hill, 967 F.2d 902, 909-11 (3d Cir. 1992)), Harrien had more than enough to support a reasonable suspicion that Defendant was engaging in illegal activity. Reasonable suspicion requires that an officer be able to point to specific and articuable facts that, taken together with rational inferences from those facts, reasonably warrant a belief that a violation has occurred. See, United States v. Payne, 181 F.3d 781, 786-87 (6th Cir. 1999)(citations omitted).

Here, at the time of the search, Harrien had Defendant's admission that he had been looking for a job on the Internet, contrary to the conditions of his probation. Harrien also knew Defendant recently had been convicted of offenses relating to the exploitation of a minor and had served a prison sentence and was currently on probation. Harrien further knew Defendant had been placed in a sex offender treatment program as a condition of his probation. In addition, he knew Defendant had recently turned in letters to his sex addiction counselor which espoused the belief that adults should be able to teach children the pleasures of sex

14

and that pedophilia was moral. He also knew that Defendant had been terminated from the sex offender treatment program because of Defendant's extreme views on pedophilia and lack of progress in his treatment. It was a reasonable inference from these events to conclude Defendant was using his computer to access child pornography and Harrien therefore had reasonable suspicion to open picture files on Defendant's computer. See, United States v. Keith, 375 F.3d 346, 351 (5th Cir. 2004)(where police learned of "otherwise innocent purchases" of pipe nipples and end caps, reasonable suspicion existed to search probationer's home since probationer had history of constructing pipe bombs).

During the course of the evidentiary hearing on the motions to suppress, Defendant testified he felt he had to sign the agreements authorizing searches or risk being sent back to jail. To the extent that Defendant is attempting to use this belated assertion to vitiate an otherwise lawful consent, the Court must reject the argument.

Defendant's assertion comes late in the game and is not credible. Presumably most, if not all, probationers and parolees would not like to be under the restrictions that are imposed. However, probationers "do not enjoy the 'absolute liberty to which every citizen is entitled.'" Griffin, supra, 483 U.S. at 874, 107 S.Ct. 3164 (quoting, Morrissey v. Brewer, 408 U.S 471, 480, 92 S.Ct. 2593 (1972)). "Just as other punishments for criminal

15

convictions curtail an offender's freedom, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law abiding citizens." Knights, supra at 119, 122 S.Ct. 487. Here, as a trade-off for staying out of jail, Defendant knowingly made certain concessions, including the one at issue in this case.

Defendant read, and had read to him, the Agreement and Directives. He voiced no questions or concerns at the time of signing, even though he was provided that opportunity. Nor did he petition the Court or the Board to change the standard conditions, as was his right. Instead, Defendant knowingly agreed to the written conditions, and he is bound by those conditions, which included consent to search his computer. Defendant cannot escape the consequences of the Agreement by now saying he did not really want to sign the Agreement or the Directives.

Given the foregoing, this Court concludes Harrien could search Defendant's computer and its hard drives in the manner in which he did. Accordingly, this Court need not look at the independent source doctrine, United States v. Jenkins, 396 F.3d 751, 756-757 (6th Cir. 2005), since the search warrant which issued as a result of what Harrien discovered was not tainted by Harrien's actions.

### 2. Seizure of Documents

Pursuant to the search warrant, police seized not only videos and pictures containing child pornography, but also certain

16

documents which the government asserts are relevant to showing that defendant violated the Tennessee statute relating to the Sexual Exploitation of Minors. According to the government, the documents at issue are the following:

> 1. Sexual Privacy for Paedophiles and Children Paper delivered by Tom O'Carroll to the Symposium on Sexual Privacy at the annual meeting of the International Academy of Sex Research, Paris, June 2000.
> 2. Sexual Offender Treatment Requiring Admission of Guilt Presented at the 15th Annual Symposium of the American College of Forensic Psychology, April 29, 1999, Santa Fe, New Mexico, Ralph Underwager & Hollida Wakefield, Institute for Psychological Therapies.
> 3. The Alleged Child Victim and Real Victims of Sexual Misuse, Hollida Wakefield and Ralph Underwager.

Docket Entry No. 25, pp. 15-16.

Defendant has moved to suppress these items on the grounds their seizure was beyond the scope of the warrant issued. The government has taken the position that "the search warrant for the computer allows search of the computer without limitation to the kinds of files that can be searched, as long as they are related to the violation of Sexual Exploitation of Minors." Id., pp. 13-14.

This Court agrees with the government that "search warrants should be interpreted by courts in a commonsense and realistic fashion rather than in a hyper-technical fashion." (Docket Entry No. 25, p. 14). However, the Court cannot take the next step suggested and find that because the underlying probable cause affidavit mentions letters, papers and other documents, the

17

warrant, which contains no such language, allowed the search of letter, papers and other documents.

This case is not like that presented in <u>United States v. Bianco</u>, 998 F.2d 1112 (2nd Cir. 1993) which is relied upon by the government. There, unlike here, the warrant failed "to particularly describe the items to be seized," <u>id</u>. at 1116, and because of that reference could be made to the underlying affidavit. Also there, unlike here, the warrant read in conjunction with the affidavit cured any ambiguity.

In this case, the warrant is very specific as to the items allowed to be seized: "any pictures, drawings, photographs, digital videos, video cassettes, computer graphic image files, or other visual representations of" minors engaged in sexual activity. Govt. Ex. 6. It is not ambiguous in any respect.

This Court simply cannot accept the government's apparent premise that a Court can resort to the underlying affidavit to determine the breadth and scope of a warrant when the warrant on its face is specific and detailed. Nor can the Court accept the underlying premise that whenever a search warrant is issued for a computer <u>all</u> files may be seized so long as they relate to the underlying crime, regardless the limitations specifically set forth in the warrant.

18

Accepting such premises would run contrary to the tenet that search warrants are to be issued by neutral and detached magistrates and judges. It would also require that the Court ignore

> [t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken nothing is left to the discretion of the officer executing the warrant.

Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74 (1927).

Here, given the clarity of the warrant, the officers had no discretion to seize documents. The warrant only allowed seizure of pictures, drawings, photographs, videos, images and other visual representations of children engaged in real or simulated sexual activity. See, United States v. Carey, 172 F.3d 1268 (10th Cir. 1999)(where warrant allowed search of computer for documents relating to drug trafficking, officers could not seize .jpg and other image files).

**B.** **Search Of Defendant's Property At Marshal's Office**

When Defendant was transferred to the Marshal's office, he brought with him numerous personal effects which were in a large bag. Pursuant to standard policy, that bag was searched and during the search, several documents were found which were subsequently turned over to the officers who had brought the Defendant from the jail to the Marshal's office.

In moving to suppress this evidence, Defendant places primary reliance upon United States v. Cohen, 796 F.2d 20 (2nd Cir. 1986)

19

claiming that the case "stand[s] for the proposition that authorities may not read a pretrial detainee's personal writings, papers and effects searching for evidence to use against him in a later trial." Docket Entry No. 17, p. 3.

It is the notion that authorities may not search for evidence to be used at a later trial which wholly distinguishes this case from Cohen. In Cohen, "the record clearly reveal[ed] that...the search of [defendant's] cell was initiated by the prosecution, not prison officials. In that case, the decision to search for contraband was not made by those officials in the best position to evaluate the security needs of the institution, nor was the search even colorably motivated by institutional security concerns." Id. 796 F.2d at 23.

Here, the Marshal's office followed standard policy which is directed to legitimate concerns about institutional safety, order and discipline. There is not a scintilla of evidence that the search was conducted at the behest of the prosecution or for prosecutorial purposes.

The Fourth Amendment requires that searches be reasonable. Obviously, both inmates and pre-trial detainees do not have the same expectation of privacy as those not incarcerated. The maintenance of prison security and the preservation of institutional order and discipline are "essential goals that may require limitation or retraction of the retained constitutional

20

rights of both convicted prisoners and pretrial detainess." <u>Bell</u> <u>v. Wolfish</u>, 411 U.S. 520, 546, 99 S.Ct. 1861 (1979). Given the difficulties inherent in jail administration, jailers are to be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Id</u>. 411 U.S. at 547.

Because of the "special needs" of jails, the constitutional rights of its inmates "are subject to restrictions dictated by concerns for institutional security, order and discipline." <u>Roe v. Marcotte</u>, 193 F.3d 72, 78 (2d Cir. 1999). Consequently, when searches are conducted in such facilities, they are not governed by the requirement that there be probable cause "as long as [such] searches meet 'reasonable legislative or administrative standards.'" <u>Id</u>. quoting, <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873-74, 107 S.Ct. 3164 (1987).

Defendant has not shown a reasonable expectation of privacy in the documents he was carrying from one detention facility to another. However, even if he had a reasonable expectation of privacy in the items in the bag, the search of those items, including the scanning of the documents, was pursuant to a policy "reasonably related to legitimate penological interest." <u>Turner v. Safely</u>, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987). Accordingly, Defendant's motion to suppress the documents found in his bag when he was brought to the Marshal's office will be denied.

21

## III. CONCLUSION

On the basis of the foregoing, Defendant's "Motion and Incorporated Memorandum to Suppress Unlawfully Obtained Evidence," Docket Entry No. 16, will be GRANTED solely with respect to any documents seized as a result of the search of Defendant's computer, drives and storage devices pursuant to the Search Warrant issued by the General Sessions Court on February 18, 2003, but DENIED in all other respects. Defendant's "Motion to Suppress Evidence Seized By United States Marshals," Docket Entry No. 17, will be DENIED.

An appropriate Order will be entered.


_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

Case 3:04-cr-00199   Document 32   Filed 08/16/05   Page 22 of 22 PageID #: 32